## AFFIDAVIT

I, Bryan Scheiber, being first duly sworn, hereby depose and state as follows:

1.      I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since June 2021.  I am currently assigned to the FBI Buffalo Field Office Cyber Task Force in Buffalo, New York, where I work on investigations relating to criminal and national security cyber intrusions. I received my Bachelor's and Master's degrees in Computer Science, have a Graduate Certificate in Computer Security and Information Assurance and hold several private sector computer security certifications. Prior to becoming an FBI Special Agent, I was a Computer Scientist with the FBI's Washington Field Office. My work in the FBI, as well as the training I have received, has familiarized me with identifying and handling evidence found in digital media, network analysis, and digital forensics. As a Special Agent with the FBI, I am empowered by law to investigate and make arrests for offenses against the United States.

2.      I make this affidavit in support of an application for a warrant to search the single-family residence located at **7 Sydney Lane, Epping, New Hampshire 03042** (hereinafter the "7 Sydney Lane"), further described in Attachment A (hereinafter the "Subject Premises"), and the person of **G.W.**[1], for evidence and instrumentalities of violations of Title 18, United States Code, Sections 1030(a)(2)(C) and (b) (Fraud and related

---

[1] **G.W.** is a minor. This may potentially limit his federal criminal prosecution. For reasons noted below, however, the offenses at issue also include participants who are *not* believed to be minors. Evidence present on **G.W.**'s devices and in his home therefore remains critical to the identity or location of other participants regardless of whether **G.W.** himself is ultimately subject to federal criminal prosecution.

activity in connection with computers), 1028(a)(7) (Fraud and related activity in connection with identification documents, authentication features, and information), 2261A (Stalking) and 875(c) (Interstate threats) (collectively, the "Subject Offenses"), further described in Attachment B.

3.     The statements in this affidavit are based upon my personal observations, my training and experience, and information obtained during the course of the investigation from other members of law enforcement, involving the review of records, interviews of witnesses, and information and reports provided. Because this affidavit is submitted for the purpose of establishing probable cause to support the issuance of search warrant, I have not included each and every fact known by the government for this investigation.

## STATUTORY AUTHORITY

4.     As noted above, this investigation concerns alleged violations of the following: Title 18, United States Code, Sections 1030(a)(2)(C) and (b) (Fraud and related activity in connection with computers), 1028(a)(7) (Fraud and related activity in connection with identification documents, authentication features, and information), 2261A (Stalking) and 875(c) (Interstate threats).

    a.  18 U.S.C. § 1030(a)(2)(C) and (b) prohibits any person from intentionally accessing a computer without authorization or exceeding authorized access, and thereby obtaining information from any protected computer, and conspiring to commit or attempting to commit an offense.

2

b. 18 U.S.C. § 1028(a)(7) prohibits any person knowingly transferring, possessing, or using, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law.

c. 18 U.S.C. § 2261A prohibits any person from with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, using the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that places a person in reasonable fear of the death of or serious bodily injury to a person, or causing, attempting to cause, or would be reasonably expected to cause substantial emotional distress to a person.

d. 18 U.S.C. § 875(c) prohibits any person from transmitting in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another.

## TERMS AND DEFINITIONS

5. *Discord* is an instant messaging and VoIP social platform that allows users to communicate via voice calls, video calls, text messaging and to share media files. Communication can be private or take place in virtual communities called "servers," which may be thought of like chat rooms. Voice over Internet Protocol or VoIP is a technology that

allows you to make voice calls using a broadband Internet connection instead of a regular (or analog) phone line.

6.    *Swatting* is where someone makes a false report of a serious crime, such as a hostage situation or active shooter, in order to send a law enforcement Special Weapons and Tactics (SWAT) team to a targeted location. Swatting may violate Title 18, United States Code, Sections 1030 (Computer Fraud), 875(c) (Interstate Threats to Kidnap or Injure), 844(e) (Bomb Threats) and 1038 (Hoaxes) based on the false report made to law enforcement.

7.    *Doxing* is the action or process of searching for and publishing private or identifying information about a particular individual on the internet, often with malicious intent. Doxing may violate Title 18, United States Code, Sections 1030 (Computer Fraud), 2261A(2) (Cyberstalking) and 119 (Protection of individuals performing certain official duties).

8.    *Doxbin* is a plain-text document publishing website used to post personally identifiable information, or a "dox", of any person of interest. Doxbin was seized during an international law enforcement initiative in November 2014 but was later re-established under different ownership. Doxbin has used the domain names doxbin.com and doxbin.org.

9.    *Virtual Private Network (VPN)* services route the user's internet traffic through the VPN provider's server network, concealing the user's original IP address and geographic location from visited websites with IP addresses assigned to the VPN provider's server network.

4

## PROBABLE CAUSE

10.    As more fully set out below, probable cause exists to believe that **G.W.** used the online moniker **OKSWTZ** where he, operating as **OKSWTZ**, was involved in doxing, swatting, online harassment, computer intrusions, interstate threats and other computer-related offenses that were openly discussed, planned and conducted. FBI's investigation found **G.W.'s** online usernames included, but were not limited to, @skidtaunter, rebirthofokswtz, totallarperdeath#6526 and coppprer.

### OKSWTZ targets Victim 1

11.    Victim 1 is a social media personality who resides in Western New York. In or around August 2023, her personally identifiable information (PII), and her family's contact information and their location were publicly posted online to Doxbin by an individual using the online moniker OKSWTZ. This is an example of doxing.

12.    On August 9, 2023 at approximately 10:59 p.m. Eastern Time, an individual started a 988 Suicide and Crisis Lifeline Chat from the IP address 87.249.134.38, claiming to be Victim 1, and stated they had shot someone. The person pretending to be Victim 1 also posted the address for Victim 1's parents' residence in Orleans County, New York[2] as the scene where the shooting occurred, to elicit an armed law enforcement response to the residence. This is an example of swatting. On multiple occasions in August and September

---

[2] Orleans County, New York is located in the Western District of New York.

2023, OKSWTZ, with assistance from others made fraudulent emergency calls to law enforcement agencies so that the police would send their SWAT teams to Victim 1's parents' home in New York.

### The Investigation to Discover OKSWTZ's Identity

13.     Around August 2023, FBI Buffalo commenced its investigation and found an X account[3], "@skidtaunter", with the display name "**okswtz**" that tweeted about Victim 1. The person behind the @skidtaunter moniker claimed credit for swatting Victim 1, listed Victim 1's Social Security Number, and listed the website address myth.rip/okswtz[4] in their account profile, which included several links to other social media accounts associated with **OKSWTZ**. One of the links listed on the myth.rip website address was a Discord account with the Discord User ID "1138540568734089317". Investigators then obtained the IP address information for this Discord account and found that the account was accessed from the IP address 87.249.134.38 on August 9, 2023 at 10:36 p.m. Eastern Time, the same IP address which conducted the 988 Suicide and Crisis Lifeline Chat on August 9, 2023.

14.     In addition, investigators also found Victim 1's personal information posted to Doxbin by a Doxbin user with the username "**OKSWTZ**". In reviewing the Doxbin posts under the **OKSWTZ** moniker, investigators found a posted comment where **OKSWTZ** stated that their Discord username was "rebirthofokswtz".

---

[3] Twitter was rebranded to X in July 2023 and the domain name was changed to x.com in May 2024.

[4] Myth.rip hosted "bio link pages", or webpages which provide a clickable hyperlink for a user's social media profile that lists hyperlinks to the user's other social media profiles, websites, online stores or individual blog posts.

**OKSWTZ's Access to Victim 1's Google Account**

15.     As part of its investigation, law enforcement obtained screenshots and video that showed the Discord virtual community **OKSWTZ** used to target Victim 1, and the conversations **OKSWTZ** had with others as they targeted Victim 1. Included in this virtual community were **OKSWTZ**, Dawnn Walters (the mother of Victim 1's ex-boyfriend), and several other individuals, where they openly discussed the targeting of Victim 1, and had general discussions about doxing, doxing tools, computer intrusions, swatting and hijacking online accounts.

16.     In early September 2023, **OKSWTZ** and Dawnn Walters conversed on the Discord server about accessing a smartphone that Victim 1 had left at Victim 1's ex-boyfriend's home and using it to compromise Victim 1's email account. On or about September 4, 2023, **OKSWTZ**, with Dawnn Walters' assistance, compromised Victim 1's Google Account by bypassing the two-factor authentication on Victim 1's email account. Dawnn Walters followed through on providing **OKSWTZ** access to Victim 1's phone. The IP address used to access Victim 1's email account was 87.249.134.33.

17.     FBI investigators interviewed Dawnn Walters where she admitted she provided **OKSWTZ** a two-factor authentication code from Victim 1's cellular telephone that allowed **OKSWTZ** to access Victim 1's Google account. Walters further stated that she communicated with **OKSWTZ** via their X account, @skidtaunter, and was in the Discord virtual community with **OKSWTZ**. Legal process showed the user who identified themselves

as **OKSWTZ** in that virtual community had the Discord account rebirthofokswtz. Further investigation of the Discord records for the rebirthofokswtz account showed the account was accessed from the IP address 87.249.134.33 on September 5, 2023. This was the same IP address that was linked to illegal access of Victim 1's email account.

**Threatening Messages sent to New York State Assembly Members using Victim 1's Email Account**

18.    On September 13, 2023, at approximately 10:21 p.m. (EST), Victim 1's Google account was used to send an email message, with photographs of deceased children and the threat to shoot up some schools in New York, to New York State Assembly members. The email had Victim 1's name listed as the sender to make it appear she was the person sending the email. Legal process for the Google account revealed it was accessed from the IP address 87.249.134.29. Investigators also reviewed records from X, relating to the @skidtaunter account. Those records revealed that the X account @skidtaunter was accessed from the IP address 87.249.134.29 on September 13, 2023 at 1:14 p.m. (EST) and on September 14, 2023 at 7:26 p.m. (EST). Investigators also observed conversations on @skidtaunter's X account where they discuss accessing Victim 1's email account and posted screenshots of internal information only found on Victim 1's Gmail account.

**Linking Various Usernames to G.W. in Epping, New Hampshire**

19.    Investigators also reviewed rebirthofokswtz's Discord conversations and found that rebirthofokswtz conversed with various individuals such as J.B.[5], M.B.[6] and Lordsekai. During the conversations, these individuals referred to rebirthofokswtz by another moniker: "copper". The conversations also discussed **OKSWTZ's** supposed role in targeting two other people: Victim 2 and Victim 3. Based on this information, investigators interviewed Victim 2 who stated that **OKSWTZ** had doxed and swatted him. Victim 2 also revealed that **OKSWTZ's** Discord username was totallarperdeath#6526. In addition, Victim 2 further provided a screen-recording of a Discord conversation between **OKSWTZ** and another Discord user that occurred around March 2023. In this conversation, **OKSWTZ** sent the other Discord user a screenshot of a dox where **OKSWTZ** was listed as the "doxer". FBI Agents then obtained legal process for the Discord account totallarperdeath#6526.

20.    Review of totallarperdeath#6526's Discord conversations found totallarperdeath#6526 discussed their detrace[7], "Edward Spielberg", which is a fictitious name, with other Discord users. Further investigation revealed a dox for Edward Spielberg on doxbin.com that listed "copper" and "c_copper" as the Doxbin usernames. Doxbin user c_copper commented on the Edward Spielberg dox and further posted a dox on August 25,

---

[5] J.B. is a minor who resides in New Jersey.

[6] M.B. is a minor who resides in New York State.

[7] A "detrace" is a fabricated online identity, sometimes based on a real individual, to support and protect an online user's real identity.

2022 titled "old teacher dox lol" with personal information for an individual in Epping, New Hampshire.

21.    Investigators also continued their review of totallarperdeath#6526's Discord conversations and found that on May 5, 2023 the person using the totallarperdeath#6526 account stated in their conversation to M.B., Lordsekai and other Discord users that at approximately 2:00 a.m. their parents had a verbal argument regarding a suspected affair, that the police were involved, that totallarperdeath#6526 waited in the car and that one parent drove off to a hotel. Discord session data for totallarperdeath#6526 showed that the user did not start a session between May 3, 2023 at 7:02 p.m. and May 5, 2023 at 4:11 p.m. (EST).

22.    FBI Agents contacted the Epping, New Hampshire Police Department who located a service call on May 4, 2023, between 1:30 a.m. to 2:30 a.m. (EST), where officers were dispatched regarding a matter involving D.P. and E.W. at **7 Sydney Lane** in Epping, New Hampshire. According to the police report, D.P. told officers that his ex was on the property and he wanted her removed. E.W. had shown up in her car at 7 Sydney Lane with her 8 year old daughter and 14 year old son in the vehicle. E.W. stated that D.P asked her to leave that night and that she had her kids in the car. E.W. explained that D.P. saw text messages and believed she was cheating on him. Officers provided E.W. with directions to a nearby hotel. Epping Police later told FBI Agents that the 14-year-old mentioned in the report was **G.W.**

**Other Information Linked to G.W.**

23.     Investigators found a ROBLOX[8] account with the name "[Victim 3]IsInHell"[9] and obtained subscriber information with legal process for the account. These records showed that the account was created on December 24, 2022 and accessed from the IP address 71.168.127.162 on January 29, 2023. Further legal process revealed that the subscriber for the IP address 71.168.127.162 was A.P.

24.     FBI Agents later learned that A.P., who was the subscriber for the IP address 71.168.127.162 that had accessed the ROBLOX account "[Victim 3]IsInHell", was the same individual identified as D.P. The A.P. subscriber name is related to D.P.'s middle name, as they are the same person.

25.     In addition, further review of totallarperdeath#6526's Discord conversations found messages exchanged between totallarperdeath#6526 and J.B. wherein J.B. asked totallarperdeath#6526 for their "main" username and totallarperdeath#6526 responded "coppprer." ROBLOX records for coppprer found the account was created on June 4, 2020, and listed the email address gavin654320@icloud.com as the user's email. ROBLOX records revealed that the account was accessed from IP addresses in New England, to include the IP address 71.168.127.162, which prior legal process linked to subscriber D.P.

---

[8] Roblox is an online game platform and game creation system developed by Roblox Corporation that allows users to program and play games created by themselves or other users.

[9] Victim 3 is a minor who resides in Texas. The ROBLOX username is redacted to protect Victim 3's identity.

26.     Further investigation into the email gavin654320@icloud.com, which was an iCloud account hosted by Apple, revealed the listed subscriber as **G.W.** and their address as **7 Sydney Lane** in Epping, New Hampshire.

27.     On April 30, 2025, an FBI Task Force Officer interviewed a New Hampshire Child Protection Service worker who stated that **G.W.** lived with his mother, E.W., and his mother's boyfriend, D.P., at **7 Sydney Lane**, and that **G.W.** was very big into electronics and had a full computer setup in the basement.

28.     Property assessment records for **7 Sydney Lane** listed the owner as D.P. Vehicle registration queries found a black 2015 Ford Taurus was registered to E.W. An FBI Agent conducted surveillance on May 1, 2025 and observed a black Ford Taurus was parked in the driveway of **7 Sydney Lane**.

29.     For the reasons stated above, probable cause exists to believe that X account @skidtaunter, Doxbin account OKSWTZ, Discord account rebirthofokswtz, ROBLOX account "[Victim 3]IsInHell" and Discord account totallarperdeath#6526 are owned by the same individual, **G.W.** Probable cause further exists to believe that **G.W.** communicated with the 988 Suicide and Crisis Lifeline Chat on August 9, 2023, that **G.W.** compromised Victim 1's Google account on September 4, 2023, that **G.W.** sent an interstate threat with that Google account on September 13, 2023, that **G.W.** resides at **7 Sydney Lane** in Epping, New Hampshire, and that evidence of the same will be found at **G.W.'s** home and on their devices, which themselves are instrumentalities of the crimes.

**SEARCH PROCEDURE**

30.     Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (e.g. computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

   a. Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

   b. Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

   c. In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any

applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

d. In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

31.     The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on

14

devices produced by other manufacturers have different names but operate similarly to Face ID.

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises

without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.  Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

32.  Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

33.  The review of electronically stored information and electronic storage media removed from the premises described in Attachment A may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.  Examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

16

b. Searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c. Surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d. Opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

## CONCLUSION

34. Based on the above information, I respectfully submit that there is probable cause to believe that evidence, instrumentalities, and fruits of violations of Title 18, United States Code, Sections 1030(a)(2)(C) and (b), 1028(a)(7), 2261A and 875(c) are located at the Subject Premises, further described in Attachment A, and on the person of **G.W.** By this affidavit and application, I request that the Court issue a search warrant for the Subject Premises and the person of **G.W.**, authorizing the seizure of the items described in Attachment B, pursuant to the protocol described in the addendum to Attachment B.

## REQUEST FOR SEALING

35. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into the criminal organizations as not all of

17

the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness. To allow the warrant to be effectuated, I respectfully request that this affidavit t remain under seal.

Respectfully submitted,

/s/ Bryan Scheiber

Bryan Scheiber

Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on June ____23____, 2025

/s/ Talesha L. Saint-Marc

HON. TALESHA L. SAINT-MARC
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

*PREMISES TO BE SEARCHED*

The Subject Premises is the single-family house located at 7 Sydney Lane, Epping, New Hampshire 03042. The house is a green, two-story residence with a white front door and an attached garage. The Subject Premises is pictured below:



19

*PERSON TO BE SEARCHED*

The person to be searched is **G.W.**, whose date of birth is ███████, 2008, including any and all personal effects, cellphones and electronic devices within the possession, custody, and control of **G.W.** at the time of the execution of this warrant, upon the following condition: **G.W.** is located in the District of New Hampshire at the time of execution of the warrant.

This warrant authorizes law enforcement personnel to:

1. Press or swipe the fingers (including thumbs) of **G.W.** against the fingerprint scanner of the device(s).
2. Hold **G.W.** in place while holding the device(s) in front of his face to activate the facial recognition feature; and/or
3. Hold **G.W.** in place while holding the device(s) in front of his face to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

Law enforcement officers will select which fingers to press to any electronic devices.

Because **G.W.** is a minor, the search, of any and all cellphones and electronic devices within his possession, custody, and control, which require the use of the device(s)' biometric features, will be conducted in the presence of one or more parent(s) or guardians(s).

20

**ATTACHMENT B**

*ITEMS TO BE SEIZED*

The items to be seized and searched from the Subject Premises and from the person of **G.W.** consist of the following evidence, instrumentalities, and/or fruits concerning violation of Title 18, United States Code, Sections 1030(a)(2)(C) and (b)  (Fraud and related activity in connection with computers), 1028(a)(7)  (Fraud and related activity in connection with identification documents, authentication features, and information),  2261A (Stalking) and 875(c) (Interstate threats) (collectively, the "Subject Offenses"), since January 1, 2022 to present, including:

1. Records, information and communications regarding the transmission of threats over text messages, telephone calls, email messages and/or the internet;

2. Records, information and communications relating to the access, use, possession or control over another persons' computer accounts, personal information and/or electronic devices;

3. Records, information and communications relating to G.W.'s online monikers, co-conspirators and the targeting of victims;

4. Evidence indicating how and when the Device was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Device owner;

5. The identity of the person(s) who communicated with the Device about matters relating to the Subject Offenses, including records that help reveal their whereabouts.

6. Computer-related documentation, meaning any written, recorded, printed, or electronically stored material that explains or illustrates the configuration or use of any seized computer hardware, software or related items;

7. Records or other items which evidence ownership or use of computer related equipment, including, but not limited to, sales receipts, bills for Internet access, and handwritten notes;

8. Items related to the state of mind of participants in the Subject Offenses at or near the time of the Subject Offenses;

9. Any passwords, encryption keys, security keys, code generators, or other devices that may be necessary to access any electronic equipment or accounts;

10. Electronically-stored data consisting of the items to be seized set forth in Attachment B;

During the execution of the search of the Subject Premises or of the person of **G.W.** law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual present at the search, who is reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

Because **G.W.** is a minor, the search, of any and all cellphones and electronic devices within his possession, custody, and control, which require the use of the device(s)' biometric features, will be conducted in the presence of one or more parent(s) or guardians(s).

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## ADDENDUM TO ATTACHMENT B

Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant authorizes the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachment A, and on the person of **G.W.** so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol:

The review of electronically stored information and electronic storage media removed from the premises described in Attachment A may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a. examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c. surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B; and

d. opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.